**MACHNE MENACHEM, INC. and Yaakov Spritzer, Plaintiffs,**

v.

**Mendel HERSHKOP, et al., Defendants.**

**No. CV–97–2550 ILG.**

United States District Court, E.D. New York.

Oct. 21, 2002.

---

17. The Court notes that there was sufficient divisible surplus to offset this claim. *See* fn. 14, *supra*.

Carl M. Bornstein, Carl M. Bornstein, New York City, Israel Weinstock, Weinstock, Joseph, Klatsky & Schwartz, LLP, Belle Harbor, NY, Bennett M. Epstein, New York City, for Plaintiffs.

Morton S. Robson, Robson Ferber Frost Chan & Essner, Noel H. Kaplan, Lapatin Lewis Kaplan & Weissmeier, PLLC, New York City, for Defendants.

Mendel Hershkop, New York City, Pro se.

Meir Hershkop, Brooklyn, NY, Pro se.

Aaron (Lelli) Hershkop, Brooklyn, NY, Pro se.

Shneur (Gadi) Hershkop, Brooklyn, NY, Pro se.

Levi Hartman, Brooklyn, NY, Pro se.

Yosef Goldman, Brooklyn, NY, Pro se.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This is a case in which two factions of the Chasidic community of Crown Heights in Brooklyn are contending for the control of a summer camp intended to provide a healthy, spiritual and physical environment for its children, in the country, far away from the heat of the city.

On May 6, 1997, the plaintiffs, a not-for-profit Corporation and Yaakov Spritzer, filed a complaint against seven named defendants consisting of 167 paragraphs extending over 50 pages and asserting eleven claims as follows: I) RICO, pursuant to 18 U.S.C. § 1962(b); II) RICO, pursuant to 18 U.S.C. § 1962(d); III) RICO, pursuant to 18 U.S.C. § 1962(c); IV) RICO, pursuant to 18 U.S.C. § 1962(d); V) Tortious Interference with Contractual Relations; VI) Fraud; VII) Conversion; VIII) Unfair Competition; IX) Breach of Fiduciary Duty; X) Assault; XI) Intentional damages to property. To characterize the complaint as prolix, replete with hearsay and irrelevancies, would be charitable. A motion has never been made, however, addressing the sufficiency, or the propriety, of that pleading. The failure to do so, it is clear, is due to the occasional and fleeting appearance and withdrawal of counsel for the defendants and their appearances *pro se* when not represented. Although ostensibly appearing *pro se* during the principal course of this litigation, the countless submissions in the form of motions, letters and assorted communica-

tions, bear the unmistakable imprint of a faceless and nameless lawyer.

After many unsuccessful attempts to induce the parties to resolve their differences peacefully for the reasons that this litigation was having a destructive effect upon the desirable objective of maintaining and operating the camp; upon the escalating exacerbation of the relationship between the parties; and, perhaps more importantly, upon the larger Chasidic community to which they belong, it became apparent and the parties agreed that a judicial determination regarding the membership of the Board of Directors of the Charitable Corporation Machne Menachem (the Corporation) would, without more, terminate this internecine warfare. Toward that end, a hearing was conducted which extended over seven days, during which extensive testimony of five witnesses was elicited.

Happily, three of the four defendants whose status as a director was in issue were represented by counsel, Noel Kaplan, Esq., of Lapatin Lewis Kaplan & Weissmeier. They were Yosef Goldman (Goldman), Shmuel Heber (Heber) and Mendel Hershkop (Mendel). The fourth was Meir Hershkop (Meir), who appeared *pro se.*

The plaintiffs Yaakov Spritzer (Spritzer) and Machne Menachem, Inc., were represented by Jeffrey Schwartz, Esq., at the hearings on September 11th, October 11th, October 15th and October 31st, 2001. At the conclusion of the hearing on October 31st, the Court directed the hearings to be resumed on December 10th, 2001. On December 7th, the Court was advised that Spritzer, acting on behalf of Machne Menachem, caused a petition pursuant to Chapter 11 to be filed with the United States Bankruptcy Court for the Middle District of Pennsylvania. That filing, and the automatic stay which it invoked, caused the suspension of this proceeding,

then in its final stages, for more than five months.

In a letter dated March 27, 2002, the Court was advised by Mr. Kaplan that, by an Order dated March 21, 2002, the Bankruptcy Court granted relief from the automatic stay and he requested a resumption of the proceedings. The granting of that request was frustrated by the motion of Jeffrey Schwartz, which was unopposed, to be relieved based upon a significant conflict of interest disabling him from continuing to represent the plaintiffs. His motion was granted on April 25, 2002. The Corporation was advised of its inability to appear *pro se* and was directed to obtain counsel by whom a notice of appearance was to be filed on or before May 6, 2002, or its case would be dismissed for failure to prosecute. In the interim, intimations that consideration was being given to converting the Chapter 11 proceeding into one pursuant to Chapter 7 prompted a motion to temporarily restrain the Bankruptcy petitioners from doing so and a temporary restraining order to that effect was issued on April 30, 2002, and stated to expire on May 6, 2002. The firm of Herzfeld and Rubin subsequently entered a notice of appearance on behalf of the Corporation; Yaakov Spritzer elected to proceed *pro se.*

At a conference held on May 6, 2002, Herbert Rubin, Esq. assured the Court that the Chapter 11 proceeding would not be converted into one pursuant to Chapter 7, and upon consent the Corporation was permanently enjoined from doing so.

The hearing which had been in a state of suspension was finally resumed on May 13th and concluded on May 20th. Oral argument was held on June 27, 2002 and the last written submission was filed July 8, 2002.

The sworn testimony of five persons was elicited over a period of seven days and captured in a transcript of approximately

seven hundred pages. A summary of the Court's findings as to those portions of the testimony deemed relevant to a resolution of this case together with its observations regarding the credibility of the witnesses will, it is believed, compel the conclusion to be arrived at.

To begin with, there is no dispute that a certificate of incorporation for Machne Menachem, Inc. was filed on July 21, 1995, and that Mendel Hershkop, Shmuel Heber, Yaakov Spritzer and Yosef Goldman were named as the founding directors. (Tr. Sept. 10, 2001 at 34–35). No by-laws were ever adopted and the ensuing chaos regarding the governance of this not-for-profit Corporation is surely attributable to that failure, and to the failure to acknowledge the existence of the provisions of the Not–For–Profit Corporation Law. (N–PCL)

The direct testimony of Yosef Goldman was exquisitely succinct, completed in 62 lines, and although not referenced, was elicited plainly with a view to N–PCL § 706 governing the removal of directors. His testimony was as follows:

Q. Did there ever come a time when you resigned as a director of the Corporation?

A. No.

Q. Was there ever an election of directors which removed you as a director?

A. No.

Q. And this is true as of today; is that correct?

A. That is correct.

Q. And it is your testimony, sir, that you're still a director of the Corporation?

A. Yes.

Q. Did you authorize the filing of this lawsuit?

A. No.

Tr. Sept. 10, 2001 at 35.

The cross-examination of Goldman then proceeded over two days and was reflected in 123 pages of transcript. The burden of that cross-examination was to establish that Goldman either voluntarily resigned as a director or was "told" by one or more of the other directors that he was "removed." (Tr. Sept. 10, 2001 at 38–39). The effort to establish either his resignation or removal centered around a disputed claim that: Goldman allegedly took $12,000 from the camp improperly; a proceeding before a Rabbinical Court (Beth Din) initiated by Goldman for the purpose of resolving that disputed claim and, incidentally, whether Goldman continued to be a director; considerable testimony concerning Goldman's role in the organization of another competing camp called Ohr Menachem; Goldman's own perception regarding his continued status as a director of the Corporation and much testimony regarding the semantic meaning of several Hebrew words, e.g., Mossed, Vaad, hanahala, as being either "organization," "institution," "administration," or "board of directors." Goldman's testimony was evasive, inconsistent and liberally sprinkled with lapses of memory. (See, e.g., Tr. Sept. 10, 2001 at 69, 70–75, 85, 86, 89, 94 99–101, 128–133, 148). That characterization of his testimony is arguably understandable relating as it was to conversations and events over a number of years occurring in an unseemly atmosphere of hostility between and among the parties, of bitterness, vengefulness, misguided self-righteousness, a disputed accusation of wrongdoing, and a deluded and questionable conviction that they were only motivated by the best interests of the children of their tightly knit community which their behavior belied, the fact remains that: (1) Goldman never received a notice from any member of the board of directors that a

meeting was to be held for the purpose of having him removed as a member of that board; (2) Goldman never attended a meeting at which the other members of the board were present for the purpose of removing him as a director; (3) he was never notified in writing that he was removed as a member of the board of directors, and (4) he never submitted a letter of resignation as a member of the board of directors of Machne Menachem. (Tr. Oct. 11, 2001 at 168–171).

Shmuel Heber was the second witness. He testified that he was an original member of the board of directors of the Corporation and never resigned from that board either orally or in writing. (Tr. Oct. 11, 2001 at 178). He recounted the reasons for becoming involved with the Corporation as being a desire to provide for the children of Crown Heights who could not otherwise afford it, a summer camp experience away from the city which would devote half days to a continuation of their religious education and half days to sports. That desire was the subject of much discussion between him and Mendel Hershkop which they sought to make a reality. They enlisted the involvement of Yaakov Spritzer who, they believed could provide the financial backing the creation of such a camp would require. (Tr. Oct. 11, 2001 at 181). Heber assumed no obligation to make any financial contribution nor was he ever advised that making such a contribution was a condition precedent to being a member of the board of directors. In addition to being a member of the board, Heber also served as the Educational Director of the camp in 1995. He declined to continue in that position the following year because, he testified, he was concerned about the manner in which Spritzer was managing camp finances and was unable to obtain any information from Spritzer regarding his concerns. (Tr. Oct. 11, 2001 at 182–18). More specifically, he was intent on seeing to it, as the Educational Di-

rector, that the camp teachers were paid before leaving camp at the end of the summer season and he feared they would not be, because Spritzer had their checks and did not attend the final camp banquet at which the teachers should have been paid. Nor were the teachers paid by Spritzer soon after returning to the city. At an emergency meeting held at Heber's house, Spritzer announced, for the first time, that the camp suffered a deficit, the exact amount of which he was uncertain. He replied, when asked, that he need not show how the deficit came about, and that he would cover it. It was for that reason, Heber testified, that he did not want to have anything further to do with Spritzer, being firm in his belief that Spritzer will do as he pleases without seeking board approval. (Tr. Oct. 11, 2001 at 182–184). As will be discussed hereafter, his belief was prophetic. Although he declined to continue as the camp's Director of Education, he still regarded himself as a member of the Corporation's board of directors, but was unwilling to attend meetings with Spritzer. He kept informed about the board through the Hershkops. (Tr. Oct. 11, 2001 at 182–184).

Following the summer of 1996, Heber believed that the community, or its rabbinical leaders would become involved, compel Spritzer to give an accounting and "reinstate the people that was the first year." (Tr. Oct. 11, 2001 at 185). Although given his imperfect command of English which the transcript reflects, it is nevertheless clear that a rabbinical court (Beth Din) was convened that fall and that Heber was less than confident about its procedures. He testified as follows:

> By the end of '96, I saw who was in Din Torah, I saw it was Din Torah, it wasn't the way—I'm sorry if I am—it wasn't the way that it should be, not the—the decisions wasn't clear and didn't even talk about issues that I thought they will

talk about, the money situation. So we saw that we have no choice by the end of '96 to go to a lawyer, to make a board meeting, and to decide all of this issue to be clear. This is when we went to Mr. Field.

Tr. Oct. 11, 2001 at 186.

Mr. Field, an attorney, was asked to review the files of the Corporation for the purpose of advising as to the composition of the board of directors. Toward that end, on February 25, 1997, he prepared a "Notice of Meeting of Directors." (Def.Ex. B). That notice, sent to Spritzer, advised that a "special meeting of the directors of Machane (sp) Menachem, Inc. will take place at the offices of Field, Lomenzo & Turret, 205 Lexington Avenue, New York, NY, 17th floor on the 17th day of March, 1997 at 2 PM for the purposes of electing one new director, electing officers, discussing the financial status of the Corporation and any other business which may properly be presented to the meeting." That Notice was signed by Mendel Hershkop. Shmuel Heber and Yosef Goldman as Directors. At the very least, that Notice evidences the understanding and belief of the three signatories that they were then still directors of that Corporation.

Mr. Spritzer did not attend the meeting. He phoned instead from the office of a Mr. Rubin, an attorney. The certified minutes of that meeting were received in evidence (Def.Ex. C) and is here set out now in full.

### Certified Minutes

The Undersigned, constituting a majority of the members of the Board of Directors of Machne Menachem, inc. (the "Corporation") do hereby certify that the following are resolutions adopted by a majority of the Board of Directors of the Corporation at a meeting duly held on the 17th day of March 1997.

"Whereas, the Board of Directors has repeatedly requested of Yaakov Spritzer copies of the books and records of the Corporation, including but not limited to its bank statements and cancelled checks from the inception of the corporation to the present date; and

"Whereas, Yaakov Spritzer has failed and refused to deliver the said records for inspection and examination by the Board of Directors, and has unilaterally removed Directors as signatories from the Corporation's bank account and has signed Corporate checks himself without authority from the Board of Directors; and

"Whereas the actions of Yaakov Spritzer may be jeopardizing the tax exempt charitable status of the Corporation and its objectives,

"NOW, THEREFORE, it is

"Resolved, that in order to protect the best interests of the Corporation, no further activities of the Corporation are to be undertaken by Yaakov Spritzer or any one else on behalf of the Corporation, no checks are to be issued by the Corporation, and no registrations for the camp or use of the camp property owned by the Corporation is to be undertaken without the direct approval of the Board of Directors of which the Undersigned are members; and it is further

"Resolved that the Board of Directors is authorized to take all action necessary to protect the best interests of the Corporation including but not limited to the commencement of legal proceedings against Yaakov Sprizter and any one acting on his behalf."

In witness hereof, the undersigned have signed this certification the 17th day of March 1997.

*L/S*

Mendel Hershkop

*L/S*

Shmuel Heber

*L/S*

Yosef Goldman

At the suggestion of Mr. Field, a letter was written to the European American Bank in accordance with the action reflected in the minutes. (Tr. Oct. 11, 2001 at 189). It was shortly thereafter that the RICO action initially referred to was commenced against Goldman, Mendel, Meir, Heber and others.

The direct testimony of Heber concluded with his assertions that he never resigned as a member of the Corporation's board of directors; was never notified in writing that he had been removed; never participated in any judicial proceeding in which the issue of his directorship was in issue; and he never told anybody that he had resigned. (Tr. Oct. 11, 2001 at 191).

The cross-examination of Heber, which was extensive, conflated, in this Court's view, active participation in the operation of a camp and membership on the board of directors of the Corporation created for the purpose of operating that camp. (Tr. Oct. 15, 2001 at 18–20). That examination, too, explored the implications of rulings of the rabbinical court (Beth Din) which were disputed and which this Court characterized on previous occasions as being vague, ambiguous and of questionable efficacy for a bearing upon the discrete issue before this Court. (Tr. Oct. 15, 2001 at 95). On the whole, having the opportunity to observe the demeanor of this witness, his responsiveness to questions put to him in the light of the limitations of his command of English, I found him to be a credible witness.

The third witness was Mendel Hershkop, the direct examination of whom is reflected in 24 lines as follows:

Q. Mr. Hershkop, did you become affiliated with a company called Machne Menachem, Inc.?

A. Yes.

Q. Were you an original director of Machne Menachem, Inc.?

A. Yes.

Q. At the time that the corporation was formed, were there three other directors?

A. Yes.

Q. Were the three directors Yaakov Spritzer, Joseph Goldman -

A. Yes.

Q. - and Schwartz Heber? (Sic. Should read Shmuel Heber)

A. Yes.

Q. Did you ever resign as a member of the board of directors of Machne Menachem?

A. No.

Q. Was a meeting ever scheduled to have you removed as a member of the board of directors?

A. No.

Q. Did you ever tell any member of the board of directors that you were no longer a member of the board of directors?

A. No.

Q. As we stand here today, are you still a member of the board of directors?

A. Yes.

Tr. Oct. 15, 2001 at 61–62.

Once again, as was the case with Goldman and Heber, the cross-examination of Mendel traversed the same ground, conflating participation in the operation of the camp with holding office as a director of the Corporation which was created to operate one; unsuccessfully attempting to reconstruct meetings and conversations with a view towards eliciting an admission

of resignation from that office or an acknowledgment that he was discharged from it; and unsuccessfully seeking to prove a determination by a Beth Din as to who were the members of the board of directors. A careful, critical, line by line reading of the cross-examination compels the conclusion that it yields not a jot or tittle of evidence to support a finding that Mendel either resigned, was removed, or abandoned his role as a director.[1] His alienation from Spritzer was due, he testified, to what he perceived to be Spritzer's conduct upon which he looked with a jaundiced eye. (*See, e.g.,* Tr. Oct. 15, 2001 at 91–92, 100–102).

It is significant to note that this witness (Mendel) subsequently learned that he was misled into believing that Goldman took money from the camp wrongfully and that what he "took" was, in fact, monies owed to him as salary, quoting at that point the biblical injunction that a workman shall be paid on the day he earns his wage. (*See* Deuteronomy XXIV, 14, 15).

The Court found this witness to be credible.

The defendants Goldman Mendel and Heber rested and the plaintiff Spritzer was then called as a witness.

His testimony is revealing in several respects. A careful and critical reading of it corroborated in eloquent detail the testimony of Shmuel and Mendel to the effect that Spritzer arrogated to himself the management of the Corporation. His direct testimony is consistent with the testimony of the prior three defendants insofar as he acknowledges that there were no formal meetings or notices of meetings of the board of directors except for the one following the camp season of 1995 and that there were no written evidences of resignations, removals, or additions to the board other than his interpretation of conversations, events and Beth Din rulings. Regarding my prior observation regarding conflating the operation of the camp with the governance of the Corporation, Spritzer confirmed the view that the two are not to be equated. On direct examination he was asked whether there was "a separate management committee under the board of directors in Machne Menachem?" His answer was: "There was a board of directors and beneath the board of directors were the salaried employees of the camp. And those were the people, those were the two tiers of structures that existed at the camp. There was the board of directors, and the people that were hired to actually run the camp. There were no other layers of directors or committees." (Tr. Oct. 31, 2001 at 43).

Sometime between 1995 and 1996, two persons, Spalter and Schreiber were added to the board—not pursuant to any formal process. *See*[2] N–PCL § 703 (Tr. Oct. 31, 2001 at 49). Hardly any mention of Spalter is made thereafter.[3] It is interesting

---

1. The Memorandum of Law on behalf of the plaintiff Corporation (Pl. Mem. at 8) refers to page 81 of the transcript of October 15, 2001, in support of its assertion that "Mendel ended his activities on behalf of [the Corporation]." The Court is unable to find any support for that assertion on that page.

2. The plaintiff Corporation makes a remarkable leap in logic to say nothing of completely ignoring § 703 of the N-PCL when it boldly declares: "As testified by Meier Hershkop at the May 20, 2002 hearing at p. 43, Schreiber was asked to 'help us.' Schreiber then assumed the position and responsibilities of director and continues as director."

3. The Memorandum of Law on behalf of the plaintiff Corporation (Pl.Mem.) is curiously at odds with the testimony of Spritzer. At two places it states that Spalter decided he was not interested in continuing *as a director* and orally resigned in 1996. (Pl. Mem. at 7). Again it declares: "As stated above, Spalter became director together with Schreiber. He withdrew as director in mid 1996. Consequently, he is no longer a director." (Pl. Mem. at 9). Spritzter testified that Spalter

to note, for example, that Spritzer testified that since the summer of 1996, the camp was run by himself and Schreiber. (Tr. Oct. 31, 2001 at 56).

Most revealing, if not disturbing, was the testimony elicited from Spritzer upon cross-examination, that in 1997 the board of directors consisted of Spalter, Schreiber and himself. (Tr. Oct. 31, 2001 at 63). However, in a notarized paper titled "Certificate of Corporate Resolution," dated January 21, 1997, Spritzer and Schreiber, the signatories to it as president and secretary respectively, are described as the "sole directors and members of the Corporation." (Ds Ex. BB)(Tr. Oct. 31, 2001 at 64–65). Spritzer's attempt to explain that away by ascribing a typographical error which should correctly have characterized the signatories as the sole officers of the corporation is unpersuasive. (Tr. Oct. 31, 2001 at 65).

Reverting to the only meeting of the board of directors of which there is any record, the one held after the camp season in 1995, it was Spritzer's testimony that the camp operated at a deficit of $75,000 that summer which he defrayed by personal loans. There is no document reflecting an agreement of the board to borrow money from Spritzer, nor is there a promissory note from the Corporation to Spritzer acknowledging an obligation to repay monies it borrowed from him. (Tr. Oct. 31, 2001 at 74).

Spritzer testified that he signed the form 990 corporate tax returns and that the returns for the years 1995 and 1996 were prepared together (Ds Ex. J) (Tr. Oct. 31, 2001 at 81). His attention was called to the "Support Schedule" in Part IVA of the '96 return which reflected

"gifts, grants and contributions" of $33,083. When asked whether that sum was contributed by him his response was "I have no idea what that represents." When asked whether he made any charitable contributions to the camp in 1995, his answer was: "There may have been a certain portion of my loans that I deducted from my loans and I considered them contributions." (Tr. Oct. 31, 2001 at 82).

Spritzer's attention was directed to the Corporate return for 1999, which was received as Defendant's Exhibit I. The "support schedule" in Part IVA of that return summarizing the gifts, grants and contributions in the years 1995–1998 reflects gifts, grants and contributions in 1996 as being $276,415. When asked to explain the discrepancy between $33,083 on the 1996 return (Def.Ex. H) and the $276,415 on the '99 return, his response was "I don't know what this number represents." (Tr. Oct. 31, 2001 at 86).

A careful examination of the returns for the years 1996–1998 gives rise to questions to which answers that were less than satisfactory were offered by Spritzer. To refer to just a few, Spritzer testified that Spalter was added to the board of directors and remained on the board through and including 1998 (Tr. Oct. 31, 2001 at 62). In each return for the years 1996–1999, in response to a direction to list the officers, directors, trustees and key employees, the only persons listed are Spritzer and Schreiber. The Corporation's returns for 1997, 1998 and 1999, each have an attachment headed "Miscellaneous Statement." The balance of loans made to the Corporation by Spritzer and Schreiber are reflected as follows:

---

remained on the board of directors through and including 1998. (Tr. Oct. 31, 2001 at 62). Giving credence to the assertion of the plaintiff Corporation, the Court would have to conclude that since mid 1996, there were only

two directors, Spritzer and Schreiber, in flagrant violation of N–PCL § 702(a) that the board of directors shall be made up of not less than three.

|           | 1996      | 1997      | 1998      | 1999      |
|-----------|-----------|-----------|-----------|-----------|
| Spritzer  | $285,210  | $464,872  | $597,672  | $741,977  |
| Schreiber | $ 55,212  | $111,122  | $368,159  | $326,367  |

No documentation of a board authorization to borrow such sums or of an obligation to repay them was provided.

The return for 1999 reflects a substantial activity in buying and selling stocks and to some extent on margin, an interest expense for which is noted. (Def.Ex. I). When asked whether the sum of $149,947 due to a brokerage firm at the beginning of 1999 was margin interest, Spritzer's response was "I have no idea." (Tr. Oct. 31, 2001 at 92). In short, Spritzer, ostensibly one of the only two directors between 1996 and 1999 had no idea which stocks were bought, which stocks were sold and how the Corporation came to have stock in its name to begin with in the amount of approximately $256,000 and when pressed for an explanation, provided one that is elusive. (Tr. Oct. 31, 2001 at 88–113).

Spritzer's testimony regarding the transfer of money and the cashing of checks between the Corporation and his own company, A–1 Merchandising, without any board involvement compel the conclusion that Spritzer had indeed, arrogated to himself the affairs of the Corporation.

As has already been indicated, the proceeding was stayed from the conclusion of the testimony on October 31st, 2001, until May 13th, 2002, when the stay required by the filing of the bankruptcy petition was lifted and the direct testimony of Spritzer was resumed.

Returning to the "Miscellaneous Statements" which were the subject of prior inquiry, those statements provided that the loans which were described above were not to be repaid "until there is sufficient working capital in the corporation." When asked "who was to make the determination

as to when there was sufficient working capital," Spritzer responded "I'm not sure" and when asked "would it have been the directors?" he answered, "I guess I would." (emphasis added) (Tr. May 13, 2002 at 15–16).

Spritzer was then questioned about a mortgage dated November 6, 2001, given by Machne Menachem, Inc., as mortgagor to Yaakov Spritzer as mortgagee, to secure the sum of one million dollars and signed on behalf of Machne Menachem by Meir Aaron Schreiber as Vice President/Treasurer. (Def.Ex. Q).[4] That mortgage was duly recorded. On the tax returns for the years 1996–1999 which were the only returns received in evidence, Schreiber is named only as Vice President. There was no evidence offered as to when he also occupied the position of Treasurer and when he ceased being the Secretary. The following colloquy that then ensued between Mr. Kaplan and Spritzer is a model of obfuscation.

Spritzer testified to the execution of a promissory note together with the mortgage and that could have been around November 6th. When asked whether there was a meeting of the board of directors approving a mortgage for $1 million, he replied "not particularly. At that time it wasn't in that amount."—and then:

Q. Did you, in fact, give personally Machne Menachem the sum of $1 million on or about November 6th, 2001?

A. It was a cumulative amount.

Q. Is that cumulative amount reflected in the tax returns of Machne Menachem which you have identified on Form 990 for calendar years 1995 through and including 1999?

4. As was indicated above, Schreiber was named only as Secretary in the "Certificate of

Corporate Resolution" dated January 21, 1997.

A. Yes.

\* \* \* \* \* \*

Q. Once again, with regard to all of the indebtedness, were there corporate resolutions approving these loans?

A. I think I said there were resolutions but they were not in writing.

Q. When did these resolutions take place?

A. On an ongoing basis.

Q. Daily?

A. No. Yearly . . . .

Tr. May 13, 2002 at 30–31.

Spritzer was then questioned about the petition in bankruptcy which he filed on behalf of the Corporation on December 6, 2001, and the "Resolutions of the Board of Directors of Machne Menachem, Inc." attached to it, signed by Meir Aaron Schreiber, V.P. (Def.Ex. R). An application to employ counsel and pay a retainer fee of $10,000 was signed by Spritzer, as President, and was granted by the Bankruptcy Court. Spritzer then testified that there was a meeting of the board of directors attended by Schreiber and himself at which a resolution was adopted authorizing the payment by Machne Menachem of the $10,000 retainer. He was then asked:

Q. Did the $10,000 come from the Corporation?

A. I don't remember.

Q. You have no recollection?

A. Either the Corporation or myself.

\* \* \* \* \* \*

Q. So, by advancing the money, was an additional debt incurred by the Corporation to you?

A. Yes.

Q. Was there a resolution of the board of directors authorizing such increase in the loan due you?

A. Yes.

Q. Who attended the meeting of the board of directors?

A. Schreiber and myself.

Tr. May 13, 2002 at 35–36.

Spritzer was then questioned about a schedule that was filed with the Bankruptcy Court which contained a list of the 20 largest unsecured claims and was received as Def. Ex. S. The first creditor listed is Meir Schreiber in the amount of $80,000 which was substantially less than the sum of $326,367 listed as the sum due him on the 1999 tax return. When asked to explain that difference Spritzer replied, "Well, this is two years later," and this colloquy follows:

Q. Did Mr. Schreiber receive payment of any of those loans?

A. He probably did, if it was reduced.

Q. He probably did. Do you know that for a fact, sir?

A. I know that for a fact.

Q. Was there a board of directors meeting authorizing the repayment of any portion of Mr. Schreiber's loans?

A. Yes, there was.

Q. When did that occur?

A. I don't have the dates.

Q. And were these repayments of the loan at one particular time, or over a period of time?

A. It may have been several payments.

Tr. May 13, 2002 at 38.

Spritzer conceded that there was not sufficient capital to repay Schreiber's loan, contrary to the representation on the tax returns that the loans were not to be repaid until there was sufficient capital.

The list of creditors also included his son-in-law, Shloime Rutman, in the amount of $123,026.14; his daughter, Raizy Rutman, in the sum of $38,880; the Spritzer

Partnership in the sum of $36,000, representing rent owed the Partnership for the office it maintained on its premises; A-1 (Spritzer's corporation) in the sum of $5,999.53; Shmuel Spritzer (Spritzer's brother) in the sum of $5,000; and Yehuda Spritzer (Spritzer's son) in the sum of $4,713.10. Tr. May 13, 2002 at 39-49.[5]

The schedule contains no reference to the stocks that were listed on the 1999 tax return and an effort to elicit from Spritzer an explanation about that was unsuccessful beyond, "We probably didn't have any stocks." Tr. May 13, 2002 at 51.

On Schedule D, Spritzer is listed as a secured creditor in the amount of $1,131,675, which is $131,675 in excess of the mortgage he holds for one million dollars and he surmised that the excess must be an unsecured loan. One can't help but conclude upon reading his testimony about the schedules submitted to the Bankruptcy Court that the information they contain is of questionable accuracy and the record of monies received and monies disbursed represent a haphazard hodgepodge of speculation.

Spritzer testified, for example, that the difference between $326,367 for the 1999 tax return that reflects Schreiber loaned the Corporation and the $80,000 owed him as an unsecured creditor as reflected on the bankruptcy schedule is explained by repayment made to him. On the "Statement of Financial Affairs" submitted to the Bankruptcy Court which requires a listing of all payments made within one year immediately preceding the commencement of the bankruptcy proceeding to creditors who are insiders, Schreiber is listed as receiving $11,000 which hardly explains the difference of $246,367 between the amount on the 1999 tax return of $326,367 and the $80,000 due him as an unsecured

creditor. Other discrepancies, ambiguities and evasions are too numerous to recount. See Tr. May 13, 2002 at 52-84. The conclusion that is compelled by his testimony is that the affairs of the Corporation were conducted by Spritzer as though it was his personal fiefdom with occasional allusions to board approval at meetings which are nowhere documented and by resolutions which were adopted and action taken only because Spritzer divines that they were.

The vigorous assertion by Spritzer that Goldman, Heber and Mendel breached a fiduciary duty they owed Machne Menachem by a fleeting involvement in Ohr Menachem upon which they embarked to provide a summer camp experience for some children of Crown Heights who would not otherwise have had it pales into insignificance when compared with the total disregard for the obligation of a director with which this record of self-dealing and financial legerdemain reeks.

The direct examination of Spritzer was thus concluded. Paul Bookson, Esq., of the Firm of Herzfeld and Rubin, then wished to have the record reflect that before he examined Spritzer, the firm represents only Machne Menachem, Inc. and that Spritzer is proceeding in this matter *pro se*. His examination of Spritzer was clearly aimed, however, at rehabilitating him. Regarding the information on the schedules discussed above, Spritzer testified that when he gets "a document that [his] attorney or accountant gives him, he will ask several questions about the general issues at hand and he'll show him where to sign it and he will sign it." (Tr. May 15, 2002 at 15-16).

██ It is appropriate to note in this regard, other inferences which may properly be drawn aside, that the law generally

---

5. The claims of those named, other than Shmuel Spritzer, are for services they are said to have rendered the camp in one capacity or another.

assumes that a person who signed a document read it and understood it. See, e.g., *Republic National Bank v. Hales,* 75 F.Supp.2d 300, 313–14 (S.D.N.Y.1999); *Moses v. Carver,* 164 Misc. 204, 211, 298 N.Y.S. 378, 387 (1937), aff'd., 254 App. Div. 402, 5 N.Y.S.2d 783 (3rd Dep't 1938) (There is a presumption of knowledge of a signed document).

Virtually all of the testimony elicited by Mr. Bookson from Spritzer and all of the testimony by Spritzer himself given in the form of a lengthy narrative, dealt with the money Spritzer loaned to the Corporation and the documents he reviewed to support those loans which were received as Ex. P–1–24.

The last witness to testify was Meir who was called by Mr. Bookson on behalf of the plaintiff Corporation. The essence of this testimony, by a witness whose command of English was imperfect, was that Spritzer arrogated to himself the operation of the camp and the administration of the Corporation. In that respect, his testimony was completely consistent with the testimony of Mendel and Heber.

Throughout his testimony, Spritzer asserted that meetings were held by him and Schreiber or by him, Schreiber and Spalter, at which corporate action was approved and yet neither Schreiber nor Spalter were called by him in support of those assertions.

The summary of the testimony as discussed above would be correctly interpreted by the reader as conveying an unequivocal skepticism of Spritzer's testimony regarding prior approval and authorization of his virtually unilateral action on behalf of the camp and the Corporation.

### Discussion

A resolution of the core issue which was the subject of this extended hearing, namely, who are the directors of Machne Menachem, Inc., a not-for-profit corporation, requires a resolution of whether the formal, explicit demands of the legislatively prescribed N–PCL should prevail over informal, seemingly *ad hoc* action by the governing board (or by those claiming to be the governing board) the body responsible for the management of the Corporation. *See,* N–PCL § 102(15). That resolution may have significant consequences as will be hereafter discussed.

### I. The Not–for–Profit Corporation Law

A. It is undisputed that a certificate of incorporation was filed with the Secretary of State on July 21, 1995, creating Machne Menachem, Inc. (the Corporation) in accordance with N–PCL § 402. That Corporation was and is a Type B corporation as defined by N–PCL § 102(b), that is, one formed for charitable, educational and religious purposes. It was the intent of the Legislature that this statutory compilation and not the general corporation law was to apply to such corporations. N–PCL § 103(b).

B. It is undisputed that this Corporation was to be managed by a board of directors because the certificate of incorporation did not otherwise provide. N–PCL § 701(a). It is also undisputed that the management of the Corporation was not vested in any person or persons other than the board of directors. N–PCL § 701(b).

C. In accordance with the provision of N–PCL § 702(a) that the board of directors shall be made up of not less than three, it is undisputed that four initial directors named in the certificate of incorporation were Mendel Hershkop, Shmuel Heber, Yaakov Spritzer and Yosef Goldman. Def. Ex. A.

D. It is not disputed that the Corporation has no members, N–PCL § 601(c),

and that no by-laws were ever adopted by the Corporation. N–PCL § 602.

E. It is undisputed that there is no provision in the certificate of incorporation for the election, appointment or term of directors, and in the absence of such a provision the term shall be one year, but not to exceed five years. N–PCL § 703(b).

1. However, each director shall hold office until his successor has been elected, appointed and qualified. N–PCL § 703(c).

F. It is undisputed that the time and place of either annual or regular meetings were not fixed by the board, nor was any special meeting called as required by N–PCL § § 710(b), (c) and 711(a).

G. It is undisputed that there is not a shred of evidence that either a president, vice president, secretary or treasurer was ever elected or appointed by the board or approved by the board. N–PCL § 713(a), (b).

H. There is not a shred of evidence in this record that transactions between the Corporation and A–1 Merchandising and Spritzer Partnership, in both of which Spritzer had a substantial financial interest, satisfied the requirements of N–PCL § 715.

I. There is not a shred of evidence in the record that the mortgage given by Machne Menachem, Inc. to Spritzer was authorized by the board as required by N–PCL § 509.

It is beyond dispute that the requirements of the N–PCL were entirely ignored and that the business of this Corporation was conducted by Spritzer and Schreiber, from and after 1996, as they in their sole discretion saw fit.

■ That failure to observe the requirements of a body of statutes specifically enacted to govern the conduct of affairs of a not-for-profit corporation may cast a cloud over the validity and hence the enforceability of its contracts, its mortgages, or the legitimacy of legal proceedings it may have instituted. It is for those reasons that a resolution in favor of the explicit, legislatively prescribed formalities is desirable, if not required.

The Court is not unmindful of the oft-cited case of *Gerard v. Empire Square Realty Company*, 195 A.D. 244, 249, 187 N.Y.S. 306 (2d Dep't 1921) in which the Court wrote:

We must recognize the fact that to a greater and greater degree all business, great and small, is being brought under the management of corporations instead of partnerships; that they are, in perhaps the majority of instances, conducted by officers and directors little informed in the law of corporations, who often act informally, sometimes without meetings of even by-laws. To hold that in all instances technical conformity to the requirements of the law of corporations is a condition to a valid action by the directors, would be to lay down a rule of law which could be used as a trap for the unwary who deal with corporations, and to permit corporations sometimes to escape liability to which an individual in the same circumstances would be subjected.

That observation was made in a business corporation case decided 48 years before the N–PCL was enacted in which the plaintiff sued for breach of a contract of employment with the defendant corporations owned by five members of a family who were not only the stockholders but also the directors. Three of the directors, acting individually, signed a paper as directors and stockholders agreeing to hire the plaintiff for one year and the evidence showed that the other two also consented. In those circumstances, the Court wrote "where the directors own all the capital stock of the corporations, where they are

members of the same family but so at variance that directors' and stockholders' meetings are not held, their action, concurred in by all, although separately and not as a body, but as the corporation" the contract of employment is valid. 195 A.D. at 249, 187 N.Y.S. 306. That is hardly this case as the findings above plainly reveal. Cf. *Amity Holding Corp. v. Eden,* 238 App. Div. 628, 265 N.Y.S. 23 (2d Dep't 1933); *Cisney v. Creighton Manor Realty Company,* 206 App. Div. 776, 200 N.Y.S. 917 (2d Dep't 1923); *Barnes v. All–American Investing Company, Inc.,* 206 A.D. 631, 198 N.Y.S. 900 (2d Dep't 1923); *Gumpert v. Bon Ami Company,* 251 F.2d 735, 738 (2d Cir.1958). An uncritically literal, carte blanche application of *Gerard* would effectively nullify the Not–for–Profit Corporation Law.

■ It is significant to note that the Corporation was brought into existence with the assistance of Howard Rubin, Esq., who was also Spritzer's lawyer prior to that time. Tr. Oct. 31, 2001 at 66. Mr. Rubin also represented Spritzer on the day in 1997 when Mendel Hershkop, Joseph Goldman and Shmuel Heber caused a notice of meeting of the board of directors to be sent to Spritzer. From the inception of this action, the Corporation and Spritzer were represented by no less than four attorneys until May of this year, when Spritzer elected to proceed *pro se.* At no time were any steps taken by the plaintiffs to recognize the existence of the Not–for–Profit Corporation Law and to invoke its provisions. By the same token, neither were any taken by the defendants who, however, for the most part appeared *pro se* until Noel Kaplan, Esq., was retained to represent the three who continue to assert their status as directors and who, for the first time, invoke the statutes.

The thrust of the plaintiffs' argument is that the defendants who still cling to their role as directors, abandoned that status by inaction over the years and by their involvement with Ohr Menachem which was inconsistent with their fiduciary duties to Machne Menachem and which were breached by that involvement. I have previously alluded to the comparative breaches of fiduciary duty by Spritzer which, at the very least, makes his airing of them noisome.

Nor is their urging of an abandonment persuasive. Throughout the course of this action, Goldman, Heber and Mendel have tenaciously insisted upon their attachment to their roles in the Corporation. Their concern for the preservation and proper management for its sole asset and its raison d'etre has been manifest continuously. As has been discussed at some length above, each has denied that he resigned his office as a director and the plaintiffs have utterly failed to establish clearly and convincingly that they surrendered their position in the Corporation either in writing, or in any other manner. *See Matter of Abramson, et al. v. Studer,* 11 N.Y.2d 773, 774, 227 N.Y.S.2d 23, 181 N.E.2d 766 (1962). The evidence established convincingly for this Court that what is alleged to be their abandonment was, instead, what I have analogized to be their constructive eviction by Spritzer. *See Kane v. Board of Trustees of Great Neck Library,* 165 Misc.2d 352, 629 N.Y.S.2d 637 (1995).

That they did not regard themselves as having abandoned their roles as directors is eloquently evidenced by a February, 1997 "Notice of Meeting of Directors" signed by each of them as Director which Spritzer ignored.

Spritzer's testimony and the documentary evidence to which reference has been made would compel a finding that after 1998 (if not before) the Corporation had only two directors, Spritzer and Schreiber, in blatant derogation of N–PCL § 702(a)

that the board of directors *shall* be made up of not less than three.

The foregoing findings of fact drives the Court to conclude that Joseph Goldman, Mendel Hershkop and Shmuel Heber are still, as a matter of law, directors of Machne Menachem, Inc. Given the laudatory purpose that Corporation was created to achieve, the members of the board may wish to make every good faith effort to work together for the continued realization of that purpose. If each of them is sincerely committed to providing a healthy and meaningful physical and spiritual summer camp experience for the children of their Crown Heights community, they *will* put their personal grievances behind them and make that effort. Failing that, they will then be left to pursue such other directions for the Corporation, consistent with an obedience to the provisions of the N–PCL or respond to such actions or proceedings as the Attorney General of the State of New York may bring. *See* N–PCL § 112.

The foregoing constitutes the Court's findings of fact and conclusions of law. The Court has considered the arguments advanced in the brief of the plaintiff Corporation which require no discussion by the Court in addition to what has been written and which, the Court, in any event, finds unpersuasive.

The parties are also advised that the Court will entertain a motion to discontinue or dismiss the RICO cause of action to which this purely ancillary state matter is an appendage.

SO ORDERED.